# 13-2840

*To Be Argued By*:
ANDREA SURRATT

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 13-2840

◄━━●●●►━━►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

OLIVIA JEANNE BOWEN, also known as Jeanne Bowen,
NOEMI DODAKIAN, also known as Emi Dodakian,
CHONG SHING WU, ROBERT INGRAM,

*Defendants,*

DAVID NORMAN, also known as Jim Norman,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

ANDREA SURRATT,
ANDREW GOLDSTEIN,
KARL METZNER,
  *Assistant United States Attorneys,*
    *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The Government's Case . . . . . . . . . . . . . . .  3

    B.  The Defense Case . . . . . . . . . . . . . . . . . . .  11

    C.  The Presentence Investigation Report . . .  15

    D.  Norman's Sentencing . . . . . . . . . . . . . . . .  17

ARGUMENT:

POINT I—Norman's Sentence Was Procedurally
    Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  24

    B.  The District Court Correctly Calculated Loss
        Amount As Greater Than $2.5 Million . . .  24

        1.  Applicable Law. . . . . . . . . . . . . . . . . . . .  24

        2.  Discussion. . . . . . . . . . . . . . . . . . . . . . .  26

    C.  The District Court Correctly Found Between
        50 and 250 Victims of Norman's Scheme .  28

        1.  Applicable Law. . . . . . . . . . . . . . . . . . . .  28

        2.  Discussion. . . . . . . . . . . . . . . . . . . . . . .  28

    D.  The District Court Properly Applied the
        Leadership Role Enhancement . . . . . . . . .  30

ii

PAGE

    1.  Applicable Law. . . . . . . . . . . . . . . . . .  30

    2.  Discussion. . . . . . . . . . . . . . . . . . . . .  33

E.  The District Court Properly Applied the
    Enhancement for Obstruction of Justice. .  35

    1.  Applicable Law. . . . . . . . . . . . . . . . . .  36

    2.  Discussion. . . . . . . . . . . . . . . . . . . . .  38

POINT II—Norman's Sentence Was Substantively
    Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  44

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

iii

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Anderson* v. *City of Bessemer City*,
    470 U.S. 564 (1985). . . . . . . . . . . . . . . . . . . . . . . . 26

*Gall* v. *United States*,
    552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . 24, 25, 44

*United States* v. *Abiodun*,
    536 F.3d 162 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 28

*United States* v. *Agudelo*,
    414 F.3d 345 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 38

*United States* v. *Beaulieau*,
    959 F.2d 375 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 31

*United States* v. *Ben-Shimon*,
    249 F.3d 98 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 37

*United States* v. *Booker*,
    543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Brennan*,
    395 F.3d 59 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 25

*United States* v. *Brinkworth*,
    68 F.3d 633 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 31

*United States* v. *Bryant*,
    128 F.3d 74 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 25

*United States* v. *Carrozzella*,
    105 F.3d 796 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 32

iv

PAGE

*United States* v. *Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . 24, 44, 45

*United States* v. *Clark,*
    316 F.3d 210 (3d Cir. 2003) . . . . . . . . . . . . . . . . 42

*United States* v. *Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . 25, 27, 43

*United States* v. *Crosby,*
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . 24

*United States* v. *Cuevas,*
    496 F.3d 256 (2d Cir. 2007) . . . . . . . . . . . . . . . . 33

*United States* v. *Dunnigan,*
    507 U.S. 87 (1993). . . . . . . . . . . . . . . . . . . . . . 36, 38

*United States* v. *Fernandez,*
    443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . 44, 45

*United States* v. *Friedman,*
    998 F.2d 53 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 37

*United States* v. *Hertular,*
    562 F.3d 433 (2d Cir. 2009) . . . . . . . . . . . . . . . . 33

*United States* v. *Ivezaj,*
    568 F.3d 88 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 33

*United States* v. *Johnson,*
    994 F.2d 980 (2d Cir. 1993) . . . . . . . . . . . . . . . . 39

*United States* v. *Jones,*
    460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . 44, 45

*United States* v. *Kelly,*
    147 F.3d 172 (2d Cir. 1998) . . . . . . . . . . . . . . . . 37

v

PAGE

*United States* v. *Kennedy*,
    233 F.3d 157 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 32

*United States* v. *Khedr*,
    343 F.3d 96 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 37

*United States* v. *Lincecum*,
    220 F.3d 77 (2d Cir. 2000) . . . . . . . . . . . . . . . 37, 38

*United States* v. *Lloyd*,
    947 F.2d 339 (8th Cir. 1991) . . . . . . . . . . . . . . . . 42

*United States* v. *Matos*,
    907 F.2d 274 (2d Cir. 1990) . . . . . . . . . . 39, 41, 42

*United States* v. *Napoli*,
    179 F.3d 1 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Ortiz*,
    251 F.3d 305 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 37

*United States* v. *Paccione*,
    202 F.3d 622 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 31

*United States* v. *Patasnik*,
    89 F.3d 63 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Pope*,
    554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 45

*United States* v. *Rigas*,
    490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 44

*United States* v. *Rigas*,
    583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . 45, 46

*United States* v. *Singh*,
    390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 25

vi

PAGE

*United States* v. *Skys*,
637 F.3d 146 (2d Cir. 2011) . . . . . . . . . . . . . . 28, 31

*United States* v. *Stephens*,
369 F.3d 25 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 36

*United States* v. *United States Gypsum Co.*,
333 U.S. 364 (1948). . . . . . . . . . . . . . . . . . . . . . . 26

*United States* v. *Wells*,
519 U.S. 482 (1997). . . . . . . . . . . . . . . . . . . . 36, 39

*United States* v. *Williams*,
79 F.3d 334 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 38

*United States* v. *Zagari*,
111 F.3d 307 (2d Cir. 1997) . . . . . . . . . . . . . . . . 37

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . *passim*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 13-2840

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

OLIVIA JEANNE BOWEN, also known as Jeanne Bowen,
NOEMI DODAKIAN, also known as Emi Dodakian,
CHONG SHING WU, ROBERT INGRAM,

*Defendants,*

DAVID NORMAN, also known as Jim Norman,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

David "Jim" Norman appeals from a judgment of conviction entered on July 15, 2013 in the United States District Court for the Southern District of New York, by the Honorable Katherine B. Forrest, United States District Judge, following a six-day jury trial.

Superseding Indictment S1 07 Cr. 691 (KBF) (the "Indictment") was filed on July 31, 2008, in two

2

counts. Norman and two co-defendants, Olivia Jeanne Bowen and Noemi Dodakian, were charged in Count One of the Indictment with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. Bowen and Dodakian were charged in Count Two of the Indictment, along with two other co-defendants, also with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

Norman was arrested on the Indictment in Canada on or about December 7, 2009, and the United States sought his extradition. During the pendency of Norman's extradition proceedings, Bowen pleaded guilty to Counts One and Two of the Indictment and was sentenced principally to a term of 63 months' imprisonment, and Dodakian was convicted of Counts One and Two of the Indictment after a jury trial and sentenced principally to a term of 95 months' imprisonment. Norman was extradited to the United States in November 2011.

Trial against Norman began on January 22, 2013 and ended eight days later, when the jury found Norman guilty on Count One of the Indictment, the sole count on which he was charged.

On July 12, 2013, Judge Forrest sentenced Norman principally to 240 months' imprisonment to be followed by three years' supervised release.

Norman is currently serving his sentence.

3

**Statement of Facts**

### A.  The Government's Case

Norman engineered and oversaw a long-running fraud that took in millions of dollars from more than 100 victims across the United States, and that lasted from 2001 until his arrest in Canada in 2009. (A. 771-73).[1] Norman's fraud, a variant of a so-called "419 scam,"[2] involved a purported investment program that Norman named after himself—the "Jim Norman Program." He enlisted co-conspirators he called "facilitators," including co-defendants Olivia Jeanne Bowen and Noemi Dodakian, to reach out to victims on his behalf. Norman and his co-conspirators concocted stories to induce their victims to wire tens of thousands of dollars at a time to them. The stories varied somewhat in their details, but they generally involved a series of lies about how Norman had been bequeathed millions of dollars that was being stored in accounts overseas, much of it tied up with the World Bank or the International Monetary Fund ("IMF"). All that was needed from the victims, said Norman and his co-conspirators, was a relatively small amount of money to "unlock" those funds. Once

_____

[1]  "A." refers to the appendix filed with Norman's appeal brief; "PSR" refers to the Presentence Investigation Report prepared by Probation in anticipation of Norman's sentencing; and "Br." refers to Norman's appeal brief.

[2]  *See generally* http://en.wikipedia.org/wiki/419_scams.

4

a final task was completed, or taxes or legal fees paid, said Norman, everyone who "invested" would receive an enormous payout. Norman and his co-conspirators perpetuated the scheme by holding frequent conference calls with victims, sending out emails, and, when necessary, dispatching Norman himself to speak to the victims. In the end, of course, none of the victims—many of whom invested more than once, at Norman's insistence—received the promised payout from the Jim Norman Program.

The evidence at trial so overwhelmingly established Norman's guilt that he does not even challenge his conviction in this appeal. The Government called five of Norman's victims to testify. Cindi Owen testified that she learned about the Jim Norman Program in the spring of 2005 through Bowen, Dodakian, and a third co-conspirator, Linda Palmer. (A. 37). Owen explained that she was told that Norman's program was "very private" and that she was being given access to the inside ways in which "the wealthy became wealthier." (A. 39-40). In 2005, Owen initially invested $50,000 (A. 41) in Norman's program and subsequently mortgaged her home and invested $75,000 more. (A. 76-77). Owen explained, through exhibits that the Government introduced as evidence, that she often exchanged emails with Norman and his co-conspirators about the specifics of the program. (A. 42). For instance, Owen explained that Norman or his co-conspirators sent her "promissory notes" for her investments, signed by Norman himself, purporting to guarantee that she would receive $2,000,000 on her original $50,000 investment and $2,250,000 for

5

her second $75,000. (A. 78, 96). Owen's mother also invested $1,000 in the Jim Norman Program. (A. 66).

Owen spoke and emailed directly with Norman and his co-conspirators during the life of the conspiracy. Before she invested the additional $75,000, Owen spoke with co-conspirator Linda Palmer, who told Owen that Norman needed her money to "free up the programs" and that if she sent him the money, it would free "up this large portfolio in Spain, and then all of the programs would be freed and they would . . . [pay] out at that time." (A. 78) In addition, Owen testified that it was important for her to speak with Norman directly before she invested the $75,000. (A. 79). Norman told Owen that he had "philanthropic and . . . humanitarian projects" and that "he was working to build orphanages around the world," things that were also personally important to Owen. (A. 79). Norman told Owen that his portfolio in Spain was worth $168 million, and that he would only need her $75,000 for ten-to-twelve days because, after that, the portfolio would be released and the investors would receive their original investment back. (A. 80, 85). Owen testified that Norman represented that there was absolutely no risk in this investment. (A. 86). This was important to Owen because, as she told Norman, she did not have cash sufficient to make the investment and would be borrowing against her family home. (A. 145). Ultimately, Owen handed over $75,000 to the fraudsters by wiring the money to an account owned by Jeanne Bowen, one of the co-conspirators. (A. 88).

6

After Owen had invested $125,000 in the bogus Jim Norman Program, she maintained contact with Norman and his co-conspirators. Occasionally, she was asked to contribute additional money. (A. 104). In October 2005, co-conspirator Noemi Dodakian emailed Owen and other investors and told them that the Jim Norman Program was about to begin paying out returns. (A. 120). Then, on December 31, 2005, Norman himself repeated this promise over email, and Owen hoped that she would finally get the money she had been promised. (A. 127).

But months and then years went by, without Owen getting a dime. In March 2007, with Owen still not having received any of the promised payout from the Jim Norman Program, she got a call from the FBI. Owen agreed to call Norman and record their conversation. (A. 138). During that recorded conversation, Norman discussed Owen's $75,000 investment, and when Owen asked Norman about the "promissory notes" that Owen believed personally guaranteed her investments, Norman said they were unenforceable. Norman then asked Owen to invest $50,000 more, which he said would assist in paying back all of the original investments. (A. 150). Owen said that she did not have any additional money, but her friend in New York—actually an undercover FBI agent—would contribute $2,000. (A. 170). Norman instructed that Owen's friend wire the money to an individual named Ann Henshaw, who Owen recalled was Norman's girlfriend. (A. 174-75). An undercover officer did in fact wire $2,000 from Manhattan to Ann Henshaw. (A. 214-19). Owen did not invest any additional money, and, unsurprisingly, never received any money

7

back on her investment from Jim Norman or his "program."

The Government also called victims Alan Title, Gregory Rodriguez, Lara Rogers, and Karl Meyers. Title, a Manhattan resident, testified that he learned about the Jim Norman Program in the summer of 2005, and spoke about the program with co-conspirators Dodakian, Palmer, and Bowen. (A. 200-01). Like Owen, Title was told that the program had money tied up in Europe. (A. 221). Title invested $50,000 in the program in October 2005 by wiring money to Bowen (A. 223; GX 157, 158), followed by an additional $5,000 in September 2005 when he was told the program needed additional money (A. 231; GX 152), with the promise of a multi-million dollar return. (A. 222). Not only did Title never see any of that seven-figure windfall, he never received a single dollar of his own money back. (A. 230).

Lara Rogers testified that she learned about the Jim Norman Program through a friend in March of 2005. (A. 262). Rogers recalled participating in telephone calls with Norman's co-conspirators and with Jim Norman himself during which she was told that Norman had money locked in offshore accounts. (A. 263, 276). Rogers was told that investing in Norman's program carried no risk because her investment would be simply to free Norman's substantial portfolio. (A. 265). Rogers ultimately sent a $30,000 investment, in increments, directly into Norman's bank account in early 2005. (A. 267). Rogers recalls that she was persuaded by the validity of the program, in part, because Norman was described by the

8

co-conspirators as a famous musician who played with Paul Schaffer from the David Letterman show. (A. 264). Rogers never received any money back from the Jim Norman Program. (A. 287). As a result, Rogers and her husband had to file for bankruptcy. (A. 288).

Dr. Gregory Rodriguez, a chiropractor, also testified for the Government. (A. 290). Rodriguez learned about the Jim Norman Program in 2004. (A. 291). Rodriguez testified that he spoke directly with Norman, who told him that the "Espavo Foundation"— one of Norman's names for his fund—was a nonprofit organization which, through the IMF and World Bank, received funds through his company, Thrum Records. (A. 296). Norman told Rodriguez that his overseas funds were worth well more than $100 million and that $130,000 was needed to pay fees and taxes to release this money, which was "tied up with" the IMF and World Bank. (A. 297, 303). Rodriguez testified that he remembered visiting Norman's website, which was introduced as Government Exhibit 332 at trial. (A. 305). Rodriguez told the jury that speaking to Jim Norman directly, as well as viewing his website, led him to invest $20,000 in the program, which Rodriguez wired directly into Norman's bank account. (A. 312, 327). Like Cindi Owen, Rodriguez was given a "promissory note" signed by Norman in exchange for his investment. (A. 312; GX 702). Rodriguez participated in many conference calls, which were hosted by Norman's co-conspirators. He described these calls as "cheerleader sessions" where the victims would be promised that the Jim Norman Program was a good investment, and to explain delay

after delay. (A. 330-31). Rodriguez never received any of his $20,000 back from Norman or the Jim Norman Program. (A. 337). As a result, Dr. Rodriguez lost his chiropractic clinic. (A. 338).

A fifth victim, Karl Meyers, a Vietnam War veteran who suffers from mobility impairment, testified that he first learned about the Jim Norman Program in 2005 from "a lady named Marchel," who directed him to Norman's website. (A. 465-66). Meyers began participating in conference calls with Norman's co-conspirators, and was told that for a $10,000 investment, he would receive a return of $760,000. (A. 467). Meyers testified that he was told that Norman had money "locked down" in Switzerland, and that Norman was raising money to pay fees to the World Bank and IMF in order to keep his money safe. (A. 467). Before he invested, Meyers spoke directly with Jim Norman, and when Meyers questioned the legitimacy of the program, Norman sent Meyers a "promissory note," which induced Meyers to invest $10,000. (A. 468, 472). A short time later, Meyers spoke with Norman again, and then invested an additional $10,000. (A. 475). Like all of the other victims who testified for the Government, Meyers never received any money from the Jim Norman Program. As a result of Norman's swindle, Meyers lost his home and ultimately became homeless. (A. 478).

Michael Miller, a cooperator who began helping the FBI after having been arrested in connection with his own Ponzi scheme, testified that in 2006 he was asked by the FBI to call Norman pretending to be a potential investor. (A. 366). Miller recorded his con-

10

versations with Norman, and the FBI also preserved emails between them. (A. 367-68; GX 501-528). In these communications, Norman repeated many of the lies that he had told his victims—that he had large accounts overseas in Geneva and Spain, and that investments in the accounts would generate substantial returns. (A. 375-76). In one email, Norman boasted about how much money he had raised from victims: "I have raised over 9 million with people that I have never met, really, I can show wire slips for 110k, 100k, 90k, 55k, etc. . . . all from phone calls, conference calls, my web sites obvious message of integrity (image with Paul Shafer of David Letterman, a fellow Canadian colleague . . . ." (A. 408; GX 522).

Employees of the World Bank and the IMF testified that the "program," as it was pitched to the victims, did not exist. Private individuals or nonprofit institutions cannot hold accounts at the World Bank, and Norman's Espavo Foundation had no account or affiliation with the World Bank. (A. 347-49). And, other than a contact with a "Jim Norman" who at one time applied for a job with the IMF, the IMF had no record of any contact or affiliation with anyone named "Jim Norman" or "David Norman," or any entity called the Espavo Foundation. (A. 497-501).

FBI Special Agent Deanna Pennetta explained some of Norman's money trail, including records from an RBC Centura bank account to which some of his victims wired money. (A. 513; GX 307). SA Pennetta summarized the in-flows and out-flows for Norman's monthly bank statements from December 2002 to March 2005, (A. 529; GX 329), explaining that during

this time period, Norman's RBC Centura account received $2,114,197.40 in deposits or transfers. (A. 537; GX 327). Between January 2004, when Norman's scheme began in earnest (and after the point when Norman admitted he had no other source of income), and March 2005, the account took in $1,856,242, mostly from large wire transfers in even dollar amounts, including money from victims who testified at trial. (GX 327). In a five-month period from November 2004 through March 2005, the account received more than $1.6 million. (A. 538). Norman's account was shut down by RBC Centura in March 2005 for, as Norman himself understood it, "excessive use of the debit card." (A. 714).

Government Exhibit 329 also showed how Norman spent thousands of dollars from this account on himself, during the same time period that he was telling victims that he needed their money to unlock funds as part of the Jim Norman Program. For instance, and among many other luxury purchases, Norman used the account to spend $2,703.72 at Genesis Menswear in Toronto, Canada; $5,733.35 at Gucci; $7,896.32 at Executive Stereo in Toronto; and $6,689.09 at Ridgepass Fine Furniture. (A. 532-33; GX 329). In addition, Norman wired tens of thousands of dollars to Ann Henshaw, who had a personal relationship with Norman. (A. 723).

## B.   The Defense Case

In his defense case, Norman called Marchel Kelley, a Wyoming resident who had "invested" in the Jim Norman Program, to testify. Kelley testified that,

12

after being promised a return of 75 times her principal, she and her sister invested $20,000 in the Jim Norman Program. (A. 577-78). Kelley, who helped recruit others to the Jim Norman Program, was promised a commission for additional money that she raised for Norman through other victims. (A. 581-82). Like the rest of Norman's victims, Kelley never received any return on her investment. Despite this, she claimed that she "still believes" in the Jim Norman Program. (A. 564).

Finally, Jim Norman testified on his own behalf. Norman testified that the money that comprised the Jim Norman Program originally came from a mysterious individual named "David" and his family from the Ivory Coast in the amount of $17.4 million. (A. 599). Norman stated that he was asked to help move this money out of the Ivory Coast and into the Western banking system. (A. 599). When Norman first heard about this money, he thought it "[s]creamed Nigerian scam." (A. 599). Ultimately, however, Norman agreed to help "David" and his brother "Desmond," even though Norman admitted to sometimes confusing which brother was which, and his direct testimony was not clear as to which brother first purportedly approached Norman. (A. 600, 601, 607). Norman clarified on cross-examination that he met Desmond first, in 2001 or 2002, and then met David approximately nine months later. (A. 740). Norman also testified about the existence of two other funds in addition to the original $17.4 million fund —a $12.4 million fund, which was David's, and a $68 million fund. (A. 741). Norman testified on cross-examination that these three sums of money ulti-

13

mately were combined into a single "Geneva account" in 2005. (A. 742). The $68 million fund, said Norman, was from an individual named "Ambrose Lewis," who was the "security manager" for, and cousin of, David and Desmond, and who wanted Norman to help move the funds out of Africa. (A. 607-08, 765). On cross-examination, when questioned about Ambrose Lewis's supposed relation to David and Desmond, Norman stated that David and Desmond were in refugee camps in Ghana, and they were "from a polygamous[ ] father [who] had more than one wife and they were a cousin" of Lewis's. (A. 767).

Norman also testified as to the various roles of his co-conspirators. He told the jury that Bowen, Dodakian, and Palmer, as well as a fourth individual in the United States named John Billingsley, all worked as "facilitators" of the Jim Norman Program, although he claimed that he did not really know Dodakian other than through occasional phone calls. (A. 609). Norman further testified that John Bailey was his long-time accountant, and that, after Norman's RBC Centura bank account was shut down, he had funds sent directly to Bailey's bank account and to the accounts of his co-conspirators. (A. 633, 715). Norman also admitted that he also had money sent directly to Ann Henshaw's account. (A. 645). On both direct and cross examination, Norman testified that he never sought money for the program from anyone who was in a "dire financial situation." (A. 641, 796).

Norman testified that in November 2005, he raised $375,500 from victims; in January 2006, he raised $340,000; after that he raised another

14

$350,000; in June 2005, he raised $270,000; and in May 2007, he raised $50,000. (A. 675-78, 692, 705; DX N, O, R, DD). Norman also testified that in May 2005, he deposited a 500,000 Euro check into a credit union account, but later learned that the check was invalid. (A. 631). Norman denied having been sued by the credit union over this fraud and instead was "given an injunction." (A. 633). Norman also testified that, after the injunction was put in place, he used his account at RBC Centura to continue to send funds overseas as part of his program. (A. 633). He further testified that the injunction "limited the ability to earn a living." (A. 635).

On cross-examination, Norman admitted that he was essentially broke from 2001-2003, which is when he began working on the Jim Norman Program. (A. 710). Then, from 2004, when he began soliciting money from victims in earnest, through 2008, Norman testified that his primary source of income was from the program, other than donations from friends. (A. 710, 730). Indeed, Norman testified that in 2001, there was a $114,000 judgment against him. (A. 710). Norman testified that other than approximately $20,000 of his own money that he invested in 2001, the rest of the funds for the Jim Norman Program were solicited from other individuals. (A. 770-71).

Norman testified that between 100 and 200 people in the United States sent him money for the Jim Norman Program. (A. 712, 772). Of these, Norman recalled that approximately three or four people were refunded their principal investment, and none received the huge payoff promised. (A. 772-73). Norman

15

testified that, over the life of the Jim Norman Program, he received approximately $9 million from investors in the U.S., Canada, Barbados, France, and Germany, although at a different point in his testimony, he estimated that he raised between $6 and $9 million for the Jim Norman Program. (A. 719, 774).

Though Norman protested that he spent only scant money on himself during this period, he admitted on cross-examination that, among other things, he bought expensive suits; $5,700 worth of Gucci luggage; a $4,300 ergonomic office chair; a $2,300 hotel stay in Ottawa, Canada; and spent over $7,000 to "upgrade" his sound system. (A. 730-32). In May 2005, Norman also purchased a $180,000 Porsche Cayenne SUV because, according to his testimony, he needed "transportation." (A. 811-12).

Norman was convicted after less than two hours of deliberations.

### C. The Presentence Investigation Report

The Probation Office's Presentence Investigation Report computed a total offense level of 37, resulting in a Guidelines range of 210 to 240 months' imprisonment. (PSR ¶¶ 53-64). Using the applicable fraud guidelines that provide an initial base offense level of seven, the PSR added 18 levels pursuant to § 2B1.1(b)(1)(J) because Norman was responsible for loss of more than $2.5 but less than $7 million; four levels pursuant to § 2B1.1(b)(2)(B) because the offense involved more than 50 but fewer than 250 victims; two levels pursuant to § 2B1.1(b)(10)(B) and (C) because the offense was committed outside the Unit-

16

ed States; two levels pursuant to § 3A1.1(b)(1) for vulnerable victims; and four levels for Norman's role as a leader of the offense, pursuant to § 3B1.1(a). The PSR noted that the Government had sought an enhancement for obstruction of justice, and deferred to the district court to decide whether an additional two-level enhancement was appropriate pursuant to § 3C1.1.

The Government disagreed with three aspects of the PSR's computation of Norman's offense level. First, the Government urged the district court to determine that the loss amount attributable to the offenses was, in fact, greater than $7 million, which would have increased Norman's base offense level by an additional two levels pursuant to U.S.S.G. § 2B1.1(b)(1)(K). Second, the Government disagreed with the PSR's addition of a two-level enhancement for vulnerable victims pursuant to § 3A1.1(b)(1). Third, the Government sought a two-level enhancement for obstruction of justice based on Norman's perjurious trial testimony. Accordingly, the Government calculated Norman's total offense level as 39, with a Guidelines range of 262-327 months' imprisonment. Because the statutory maximum penalty for Norman's offense of conviction was 240 months' imprisonment, the Government calculated Norman's Guidelines range as 240 months. (A. 921-22).

For his part, Norman argued that he was responsible only for a loss of between $1 million and $2.5 million, and that he defrauded only 13 victims, as opposed to between 50 and 150, because, according to Norman, the district court should have considered

17

only those victims who testified at trial or whose names were specifically mentioned in the trial testimony. Norman also objected to the application of a four-level enhancement for his leadership role in the offense, and the two-level enhancement for obstruction of justice. Norman agreed with the Government that the two-level vulnerable victim enhancement was not appropriate.

## D. Norman's Sentencing

At the sentencing proceeding on July 12, 2013, Judge Forrest made her own Guidelines calculation. (A. 965). In determining the appropriate loss amount, Judge Forrest noted that U.S.S.G. § 2B1.1, application note 3C provides methods for estimating loss amount when necessary, such as examining the "scope and duration of the offense and revenues generated by similar operations." (A. 976). Judge Forrest rejected Norman's argument that calculation of the loss amount should be determined solely by the evidence the Government introduced at trial. (A. 977). Judge Forrest also rejected the notion that, in computing loss amount, the "Court should ignore the testimony of Mr. Norman himself." (A. 978). Noting that the law permits a factfinder to credit parts of a witness's testimony and discredit others, Judge Forrest credited Norman's testimony in which he told Judge Forrest that he had received between "six and nine million dollars." (A. 978). Judge Forrest also relied on the defendant's RBC Centura bank account, which showed intake of "over two million dollars just for the short period of time that we have." (A. 980). Judge Forrest noted that bank records were not available

18

for the remaining period of the scheme, but that
Norman testified that he continued to receive money
after the account was closed. (A. 980).[3] Judge Forrest
also explained that 'investors were not paid money
back," and so "it is reasonable for the Court to rely on
the bank records as indicia [of loss amount] even with
a discount for a few items here or there that may not
have been related to the scheme." (A. 980). Moreover,
Judge Forrest noted, "when the bank account was
closed down in March of '05, the program went on for
three and a half more years," which allowed Judge
Forrest to extrapolate that the Jim Norman Program
took in *at least* an additional $5 million. In sum,
Judge Forrest noted that it found "well in excess of a
preponderance of the evidence that there is a very
strong basis to find that the loss amount is . . . more
than $2.5 million" and, therefore, an 18-level en-
hancement was appropriate. (A. 979).

With respect to the number of Norman's victims,
Judge Forrest explained that Government Exhibit
328, which showed wire transfer inflows into Nor-
man's bank account, along with Norman's own testi-
mony that he had no other significant source of in-
come during the period the bank account was receiv-
ing money, sufficed to conclude by a preponderance of
the evidence that the number of victims was well
above 50. (A. 981). The Court's conclusion was bol-
stered by Norman's own testimony in which he "very

––––––––––

[3]   At sentencing, the Court noted that, during
this explanation, Norman was "nodding his head . . .
and smiling." (A. 980).

19

proudly proclaimed . . . that there were more than 100 people in the United States who had sent him money." (A. 982). Accordingly, the Court added four levels to Norman's Guidelines range pursuant to § 2B1.1(b)(2)(B). (A. 982).

Next, the court agreed with the parties and declined to impose a vulnerable victim enhancement. But, the court did impose a four-level leadership role enhancement pursuant to U.S.S.G. § 3B1.1. The court found that Norman was a leader of a conspiracy that included five or more participants, including Billingsley, Dodakian, Palmer, Bowen, Bailey, and Ann Henshaw, and further found that Norman's scheme was extensive. (A. 983-84). The court explained that, among the evidence demonstrating Norman's leadership role was the fact that the program bore his name, Norman's signature was on the promissory notes, and Norman was the one from whom information about the program originated. (A. 984).

Judge Forrest then noted that there was no objection to the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), and independently concluded that the enhancement was appropriate for either sophisticated means or for the crime taking place outside the United States since Norman was in Canada while he was orchestrating his scheme.

Finally, Judge Forrest concluded that a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 was appropriate in this case. (A. 985). Judge Forrest rejected Norman's argument that she was not permitted to rely on portions of his testimony to determine loss amount and number of

20

victims and find other portions of the testimony perjurious. (A. 987). Instead, as Judge Forrest explained, "[t]he law allows the finder of fact in a sentencing proceeding . . . to credit some but not all of the testimony" since "some witnesses tell the truth sometimes and lie other times . . . there can frequently be and there is frequent[ly] a mixed bag." (A. 987). The court —which had the benefit of observing Norman while he took the stand at trial—determined that, in this case, "there was some perjurious testimony and there was some truthful testimony." (A. 987).

Judge Forrest found that, in his testimony, Norman made numerous false statements about material matters, with the conscious objective of obstructing justice. (A. 988). Indeed, she found that Norman's "lies were so numerous and so brazen that it is breathtaking." (A. 989). Judge Forrest cited several specific instances of false testimony. First, Judge Forrest found that Norman lied about how the Jim Norman Program came to exist. (A. 988). Norman testified to "different instances of the whens and the hows and the whos and there are specific changes in terms of the amounts in the accounts." She determined that, contrary to Norman's testimony, "it is false that the accounts even existed," which is, by itself "specific perjurious testimony designed . . . to have the[] jury acquit him." (A. 988). Second, Judge Forrest found that Norman had lied as to "the role of the brothers [and] confused which brother was which." In fact, during his testimony, Norman "was able to come up with a relationship of a third person, Ambrose, as being a polygamist cousin to the alleged brothers." (A. 989). Judge Forrest noted that "the lies just went

21

on and on about how all of the bits and pieces work, many of which if credited would have been the basis that he would have used to raise a reasonable doubt as to his guilt." (A. 989).

Third, Judge Forrest found that Norman lied as to the origin of the 500,000 Euro fraudulent check that was deposited into a credit union account maintained by Norman in May 2005. (A. 989). Fourth, Judge Forrest found that Norman lied about whether he took money from people who could not afford to invest in his program. (A. 990). She noted that, in fact, Norman was recorded trying to convince Cindi Owen to send him more money even after she told him she no longer had money to send. (A. 990). Overall, Judge Forrest found that, because she heard the testimony of the victims, she was "able to assess . . . the truth of how he would solicit money, his methods for soliciting money" and could compare that to "his testimony at trial." (A. 990).

Aside from his perjury at trial, Judge Forrest also found that Norman had attempted to obstruct justice in advance of his sentencing proceeding. Shortly before his sentencing, Norman submitted two letters that, among other things, stated that Norman had recently received some money from overseas indicating that his program was real. (A. 988, 990, 1015). Judge Forrest found that the letters were an attempt to deceive the court, and they indicated that Norman "is still engaged in the scheme even today." (A. 990).

Based on her findings, Judge Forrest determined that Norman's base offense level was 37, and his criminal history category was I. (A. 991). Norman's

22

Guidelines range was therefore 210-262 months' imprisonment. Because the statutory maximum for the offense of conviction was 240 months' imprisonment, Norman's Guidelines range was 210-240 months' imprisonment.

Having computed the Guidelines range, Judge Forrest next turned to the factors under Title 18, United States Code, Section 3553(a), and noted that the court took "all of the 3553(a) factors into account to achieve . . . a sufficient but not greater than necessary sentence." (A. 1011). Judge Forrest began by noting that Norman's conduct was "reprehensible." Norman "took other peoples['] money knowing full well that [he] was lying to them . . . and allowing others to lie to them on [his] behalf." (A. 1013-14). And worse, Judge Forrest explained, Norman took this money while his victims lost their homes, were living in their cars, and lost their ability to practice their profession. (A. 1014). She explained: "The nature and circumstances of your crime and your history and characteristics display that you committed it with a kind of intentional behavior that is indicative of a capability of planning and carrying out elaborate frauds without compunction." (A. 1016-17).

Judge Forrest further noted that specific deterrence was particularly important in this case because even after Norman was convicted—and after hearing unimpeachable evidence that the purported accounts at the World Bank and the IMF did not exist—Norman continued to solicit money from victims from inside prison. (A. 1015). She cited emails from Norman that the Government submitted in advance of

23

the sentencing proceeding in which Norman, while in prison awaiting sentencing, continued to try to solicit money from outsiders, telling victims that "dough" was needed "to release dough." (A. 1005).

Ultimately, Judge Forrest imposed a sentence of 240 months' imprisonment, which was both within Norman's Guidelines range and the statutory maximum for the offense of conviction. Judge Forrest explained that this sentence was "necessary for the protection of society," and that it will keep Norman "away from people so [he] cannot take away their livelihood." (A. 1017). Judge Forrest stated that she would have imposed this sentence "irrespective of the calculation of the offense level" and that the "guidelines do not necessarily play a role in my determination as to the appropriate sentence" because the "appropriate sentence is based on [the court's] independent determination under 3553(a) as to what" sentence is appropriate for Norman. (A. 1017). Judge Forrest stated that she would have imposed a higher sentence but was "limited by the statutory maximum." (A. 1017). She also imposed restitution in the amount of $1,731,805.34, forfeiture of $2,197,637.04, and three years' supervised release. (A. 1019, 1020).

## A R G U M E N T

### POINT I—Norman's Sentence Was Procedurally Reasonable

Judge Forrest properly calculated Norman's Sentencing Guidelines range, considered the § 3553(a) factors, and made fully supported findings of fact. As

24

a result, Norman's sentence was procedurally reasonable.

## A. Applicable Law

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc); *see generally United States* v. *Booker*, 543 U.S. 220 (2005); *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). A district court "commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), makes a mistake in its Guidelines calculation, . . . treats the Guidelines as mandatory[,] . . . does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *United States* v. *Cavera*, 550 F.3d at 190 (internal citations omitted); *see also Gall* v. *United States*, 552 U.S. 38, 51 (2007). Procedural error also occurs if the sentencing judge fails to provide an adequate explanation for the sentence imposed, which should include an explanation for any deviation from the Guidelines range. *Gall* v. *United States*, 552 U.S. at 50.

## B. The District Court Correctly Calculated Loss Amount As Greater Than $2.5 Million

### 1. Applicable Law

Under Section 2B1.1 of the Guidelines, a defendant's offense level is based in part on the amount of "loss" involved in the offense. *See* U.S.S.G. § 2B1.1(b)(1)(A)-(P). "Loss" is defined by the Guide-

25

lines as "the greater of actual loss or intended loss." *Id.*, cmt. n.3(A). "Actual loss"—the only kind of loss at issue here—is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. n.3(A)(i). The "offense" includes the defendant's "relevant conduct," and also all acts and omissions of a defendant and his co-conspirators (if reasonably foreseeable to him) "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States* v. *Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt n.3(C); *United States* v. *Singh*, 390 F.3d 168, 192 (2d Cir. 2004) ("A reasonable estimate of the loss is all that is necessary."). Of course, "[i]n determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States* v. *Coppola*, 671 F.3d 220, 249 (2d Cir. 2012). "Such evidence need not, however, establish loss with absolute precision; it need only permit the district court to make 'a reasonable estimate of the loss' given the available information. *Id.* at 250 (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)).

This Court reviews a district court's calculation of loss amount for clear error. *United States* v. *Brennan*, 395 F.3d 59, 74 (2d Cir. 2005). "A finding is 'clearly erroneous' when, although there is evidence to sup-

port it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson* v. *City of Bessemer City*, 470 U.S. 564, 573-74 (1985). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

## 2. Discussion

Norman argues that Judge Forrest improperly computed the loss amount by basing its finding solely on Norman's testimony at trial. This is patently false. In reality, Judge Forrest considered Norman's testimony in the context of all of the other loss amount evidence that was presented in the Government's case-in-chief. For instance, the District Court noted that the Government presented evidence of Norman's only U.S.-based bank account that was maintained during the course of his scheme. (A. 978, 980). From between December 2002 to March 2005, Norman's account received $2,114,197.40 in deposits or transfers—less than $500,000 short of the $2.5 million needed for the Guidelines loss amount applied by the district court. Judge Forrest noted that this account was closed in March 2005, but Norman's scheme continued for at least three more years. Judge Forrest then estimated that if the account had continued to

27

take in money from victims at the 2005 rate for those three additional years, the loss amount would increase to at least $5 million. (A. 981). And, of course, evidence at trial established that victims wired money not only to Norman's RBC Centura account, but also to the accounts of various co-conspirators. Based on this computation alone, Judge Forrest made "'a reasonable estimate of the loss' given the available information." *United States* v. *Coppola,* 671 F.3d at 249. But, in addition to this extrapolation based on the RBC Centura bank records, Judge Forrest also reasonably relied on Norman's own testimony.

Indeed, Norman's testimony about loss amount corroborated the evidence that the Government presented in its case-in-chief. As Judge Forrest recounted at the sentencing proceeding, Norman specifically estimated that he had collected between $6 and $9 million from his victims through the Jim Norman Program, a figure that aligns with other evidence presented at the trial. (A. 978). Moreover, Norman, aided by emails that were introduced as defense exhibits, testified as to specific amounts that he recalled raising: $375,500 in November 2005; $340,000 in January 2006; $350,000 sometime after that; $270,000 in June 2005; and $50,000 in May 2007. (A. 675-78, 692, 705). Thus, unlike in other portions of his testimony, where Norman was shifty and vague, when he spoke about loss amount, Norman was decisive, specific, and confident—testimony that Judge Forrest witnessed firsthand. Judge Forrest did not err in crediting this portion of Norman's testimony, which, in her view, established well beyond a pre-

28

ponderance of the evidence that Norman was responsible for loss amount in excess of $2.5 million.

## C. The District Court Correctly Found Between 50 and 250 Victims of Norman's Scheme

### 1. Applicable Law

Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), a four-level sentencing enhancement is appropriate if the applicable offense "involved 50 or more victims." U.S.S.G. § 2B1.1(b)(2)(B). The number of victims is based on those who sustained losses based on the conduct at issue. *United States* v. *Abiodun*, 536 F.3d 162, 169 (2d Cir. 2008) ("The Guidelines' adjustment for the number of victims refers to the victims who sustained losses as determined by the loss calculation Guideline."). Just as with loss amount, the calculation of the number of victims is a factual finding reviewed for clear error. *See, e.g.*, *United States* v. *Skys*, 637 F.3d 146, 152 (2d Cir. 2011).

### 2. Discussion

Judge Forrest rightly rejected Norman's argument that that the "number of victims should be limited to those who [were] identified by witnesses at the trial." (A. 981). Instead, she correctly determined that the Government's evidence at trial, coupled with Norman's testimony, easily established by a preponderance of the evidence that the number of Norman's victims exceeded 50. Judge Forrest relied on Government Exhibit 328—the bank summary chart—which shows a total of 272 wire transfers coming into Norman's RBC Centura account, 179 of which were in

29

the five-month period between November 2004 and March 2005. The incoming wires are nearly all from individuals and are in large, rounded dollar amounts. Among the names listed as sending wires to Norman were victims who testified at trial such as Lara Rogers. Norman testified that he had no other source of income during this period, so it is reasonable to infer that every dollar coming into this account was money stolen by Norman and his con-conspirators.

Norman argues that because some of the wire transfers into the RBC Centura account in Government Exhibit 328 appear to be from entities associated with Norman himself—such as "David PJ (Jim) Norman" or "Thrum Records"—Judge Forrest was not permitted to conclude that the numerous other wire transfers represent victims of Norman's fraud. Indeed, Norman appears to be advocating for a rule that would require district court judges to count victims based only on direct proof presented as to each of those victims. (Br. 22). This is not the law, and for good reason: in a wide-ranging, high-dollar, continent-spanning fraud scheme such as Norman's, this rule is unworkable and would grossly undercount the true number of victims. Judge Forrest did not clearly err in determining the number of Norman's victims. Though a small number of the 272 incoming wires into Norman's are fairly characterized as wire transfers from non-victims, the vast majority—and easily

30

more than 50—can be characterized as money that victims sent to the fraudulent Jim Norman Program.[4]

## D. The District Court Properly Applied the Leadership Role Enhancement

Norman also challenges the district court's decision to apply a four-point leadership role enhancement pursuant to Section 3B1.1 of the Guidelines. Norman argues that the Government did not establish that Norman was the leader of a scheme involving five or more participants, nor that the scheme was otherwise extensive.

To the contrary, Norman's own testimony, other witness testimony, numerous emails, and bank records, easily established Norman's leadership role in the scheme, the involvement of five or more participants, and that the scheme was extensive.

### 1. Applicable Law

Section 3B1.1(a) of the Sentencing Guidelines requires the sentencing court to increase a defendant's

---

[4] Norman spends much time in his brief arguing that Judge Forrest did not accept the factual recitation in the PSR. (Br. 22-23). This is both untrue (*see* A. 969 ("[T]he PSR will be . . . made part of the record in this case.") and irrelevant, because Judge Forrest's factual findings at the sentencing proceeding sufficed for this Court to conclude that she did not clearly err in computing the number of Norman's victims for purposes of the Guidelines calculation.

offense level by four levels "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B.1(a). The application notes define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.*, app. note 1. Moreover, a defendant can "be included as a participant when determining whether the criminal activity 'involved five or more participants' for purposes of a leadership role enhancement." *United States* v. *Paccione*, 202 F.3d 622, 625 (2d Cir. 2000). Lastly, "[i]n assessing whether a criminal activity 'involved five or more participants,' only knowing participants are included." *Id.* at 624; *see also United States* v. *Brinkworth*, 68 F.3d 633, 642 (2d Cir. 1995) (finding that the accountant was not an "uninformed, 'unwitting' participant on the outskirts of a criminal conspiracy" because he knew "that income reported on financial statements . . . must be reported on tax returns.").

Among the factors bearing on whether a defendant is a "leader" are the "degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States* v. *Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992); *see also* U.S.S.G. § 3B1.1, comment. (n.4) (instructing that in determining whether a defendant is a leader or organizer, as opposed to a manager or supervisor, "[f]actors the court should consider include the exercise of decision making authority, the nature of participant in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits

32

of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others").

"[I]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n.3). In *United States* v. *Carrozzella*, 105 F.3d 796 (2d Cir. 1997), this Court held that in "determining whether a criminal activity is 'otherwise extensive' as the functional equivalent of one involving five or more knowing participants," the relevant factors are (1) the number of knowing participants; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme. *United States* v. *Carrozzella*, 105 F.3d at 803-04, *abrogated in part on other grounds by United States* v. *Kennedy*, 233 F.3d 157, 160-61 (2d Cir. 2000); *see also United States* v. *Patasnik*, 89 F.3d 63, 69 (2d Cir. 1996) (upholding the district court's determination that the scheme was "otherwise extensive" where the only two participants in the scheme used "the services of at least five other individuals-including their lawyer and their accountant-to help them execute the scheme, as well as various loan brokers."); *United State*s v. *Napoli*, 179 F.3d 1, 15 (2d Cir. 1999) (upholding the district court's finding that the scheme

33

was "otherwise extensive" where defendant used ca-
sino and casino personnel to cash and launder
checks).

Finally, in keeping with the standard of review
that generally applies when considering a district
court's application of the Guidelines, factual determi-
nations regarding the role a defendant played in an
offense must be sustained unless clearly erroneous.
*United States* v. *Ivezaj*, 568 F.3d 88, 99 (2d Cir. 2009)
("We typically review a district court's factual find-
ings in support of a role enhancement for clear er-
ror."); *United States* v. *Cuevas*, 496 F.3d 256, 267 (2d
Cir. 2007) (finding that, on review, the factual deter-
minations of the district court are accepted unless
clearly erroneous); *see also United States* v. *Hertular*,
562 F.3d 433, 449 (2d Cir. 2009) ("In general, we re-
view a district court's determination that a defendant
deserves a leadership enhancement under § 3B1.1 *de
novo*, but we review the court's findings of fact sup-
porting its conclusion only for clear error.").

## 2.  Discussion

The District Court found by a preponderance of
the evidence that "Mr. Billingsly, Ms. Dodakian, Ms.
Palmer, Ms. Bowen, Mr. Bailey, Ms. Henshaw, [and]
Mr. Norman" were criminally responsible partici-
pants in the fraudulent scheme. (A. 983). There was
no error in this finding. At sentencing, counsel for
Norman conceded that the testimony of the victims at
trial sufficiently established that "Billingsly and
Dodakian and Bowen" were criminally culpable for
the purposes of the leadership role enhancement.

34

(A. 997-98). Indeed, the evidence was overwhelming on this point: numerous witnesses testified that Billingsly, Dodakian, and Bowen served as "facilitators" who recruited victims on behalf of Norman into the Jim Norman Program, and then served as intermediaries between Norman and his victims when, time and again, the money that Norman had promised failed to come through.

Moreover, as Judge Forrest found, there were other co-conspirators in addition to Billingsly, Dodakian, and Bowen, including Linda Palmer, who helped recruit Cindi Owen on behalf of Norman, and gave Owen the same false assurances that Owen received from Dodakian. (A. 77-78). That evidence, by itself, is sufficient to support the District Court's application of the leadership role enhancement. There was also sufficient evidence to support Judge Forrest's finding that Norman's accountant, John Bailey, and Norman's acquaintance, Ann Henshaw, were knowing participants in the scheme. Both Bailey and Henshaw accepted wire transfers from Norman's victims, and then wired victim money overseas at Norman's direction—allowing Norman to take in money from victims even after his bank account at RBC Centura was closed. (A. 645, 725, GX 327). Accordingly, Judge Forrest had more than a sufficient basis to find that the scheme involved five or more participants.

There was also plainly sufficient evidence to conclude that Norman was a leader—in fact, the leader —of the scheme. Norman named the program after himself, he built the website that lured victims to give him money, he signed the promissory notes pur-

35

porting to guarantee his victims' investments, and he directed the messaging as more and more victims were recruited and as victims were asked to invest over and over again. (A. 80, 85, 296-97, 305, 408, 468, 472, 675-78, 710, 172, 772, 774).

Finally, there was also sufficient evidence to support Judge Forrest's alterative finding that Norman's scheme was "otherwise extensive." In addition to the seven participants set forth above (Billingsly, Dodakian, Bowen, Palmer, Bailey, Henshaw and Norman), Norman used numerous unknowing participants to carry out the scheme. He used his victims to recruit other victims into the program. As just one example, defense witness Marchel Kelly, who was referred to Jim Norman by her sister (A. 577), testified that she in turn helped recruit other investors at Norman's direction. (A. 564). Norman's use of victims and other recruiters in the United States was essential to carry out his scheme, as he resided in Canada, and most of his victims lived in various locations throughout the United States. The involvement of such a large number of victims, the geographic breadth of the scheme, and the use of co-conspirators to both recruit victims and keep them in line when the money never showed up are all sufficient bases for the court's finding that the scheme was "otherwise extensive" pursuant to Section 3B1.1 of the Guidelines.

### E. The District Court Properly Applied the Enhancement for Obstruction of Justice

Norman also contests Judge Forrest's application of the two-level enhancement for obstruction of jus-

36

tice pursuant to Section 3C1.1. Norman argues that his testimony at trial, "though perhaps unbelievable," "expressed his ongoing belief in the fraud scheme" and therefore, "was not willfully intended to obstruct the proceedings." (Br. 29-30). Norman further argues that application of the enhancement would doubly punish him because his false testimony pertained to the same fraud that formed the basis for his conviction. (Br. 29-31).

Norman's arguments are meritless. Simply put, Judge Forrest correctly found that Norman "perjured himself with the conscious objective of obstructing justice." (A. 986-87).

## 1.  Applicable Law

Section 3C1.1 of the Guidelines mandates a two-level upward adjustment of the offense level if the "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G § 3C1.1. This provision applies to a defendant who commits perjury, or who provides "materially false information to a judge or magistrate." U.S.S.G. § 3C1.1. Perjury occurs when a witness "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993), *abrogated on other grounds by United States* v. *Wells*, 519 U.S. 482 (1997); *see also United States* v. *Stephens*, 369 F.3d 25, 26-27 (2d Cir. 2004). For sentencing

37

purposes, perjury need only be proved by a preponderance of the evidence. *See United States* v. *Khedr*, 343 F.3d 96, 102 (2d Cir. 2003); *United States* v. *Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001).

Moreover, it is well settled that "the obstruction of justice enhancement [under Section 3C1.1] . . . is *mandatory* once its factual predicates have been established." *United States* v. *Friedman*, 998 F.2d 53, 58 (2d Cir. 1993) (emphasis added); *accord United States* v. *Ortiz*, 251 F.3d 305, 306 (2d Cir. 2001) ("'[u]nder the Guidelines . . . the sentencing court is required to adjust a defendant's offense level upward' if the defendant obstructed justice") (quoting *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000)).

Where the Government moves for a Section 3C1.1 enhancement based on the defendant's perjured testimony, "a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States* v. *Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). With regard to the willfulness requirement, the Government must prove that "the defendant's statements unambiguously demonstrate an intent to obstruct." *United States* v. *Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998). With regard to the "materiality" requirement, the commentary to Section 3C1.1 defines "material" evidence to mean "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination. U.S.S.G. §3C.1.1, comment. (n.6). Thus, if the district court finds that the defendant "has clearly lied" in a state-

38

ment made under oath, it "need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." *United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996); *see Lincecum*, 220 F.3d at 80.

This Court will not overturn a district court's findings of fact regarding the imposition of an obstruction of justice enhancement unless those findings are clearly erroneous. *See United States* v. *Agudelo*, 414 F.3d 345, 348 (2d Cir. 2005). The district court's rulings "that the established facts constitute obstruction of justice" is reviewed *de novo*, "giving 'due deference to the district court's application of the guidelines to the facts.'" *Id.* at 348 (quoting *Lincecum*, 220 F.3d at 80).

## 2. Discussion

Norman first claims that because his testimony was "unswerving" with respect to the underlying investment scheme, Judge Forrest erred in finding that he "willfully intended to obstruct the proceedings." (Br. 29). He argues that his testimony on direct "does not contest that he engaged in the conduct that formed the basis of the charge against him, but rather, expressed his ongoing belief in the fraud scheme." (Br. 30).

Norman's argument ignores the multiple lies he told in his effort to avoid conviction. Although Norman does of course have the right to testify in his own defense, his "[r]ight to testify does not include a right to commit perjury." *United States* v. *Dunnigan*,

39

507 U.S. 87, 96 (1993), *abrogated on other grounds by United States* v. *Wells*, 519 U.S. 482 (1997); *see also United States* v. *Johnson*, 994 F.2d 980, 988 (2d Cir. 1993) ("Right to testify does not include a right to commit perjury."); *United States* v. *Matos*, 907 F.2d 274, 276 (2d Cir. 1990) ("A defendant has no protected right to testify falsely."). Thus, despite Norman's attempt to re-characterize his testimony at trial, he had an obligation to answer truthfully upon taking the stand, especially when presented with information—information he was well aware of during the operation of the scheme—that disproved his "insistently" held beliefs.

Judge Forrest based her obstruction finding on numerous separate instances of false testimony given by Norman—any one of which would support application of the enhancement pursuant to Section 3C1.1 of the Guidelines. Norman's materially false testimony included the following:

Norman lied about the origins of the accounts that he testified to have existed at the IMF and the World Bank, and he lied about the relationship of the individuals from the Ivory Coast who purportedly provided the initial funding for Norman's bogus accounts. In his direct testimony, Norman stated that his program began when two brothers named David and Desmond contacted him to help them move $17.4 million and $12.4 million out of Africa. (A. 599, 607). Judge Forrest found that Norman lied about and often confused the relationship between the two brothers. And when "caught in an inconsistency about the relationship," he was "at one point with just an amount of ease and

really astounding to watch was able to come up with a relationship of a third person, Ambrose [Lewis], as being a polygamist cousin to the alleged brothers." (A. 989). For example, Norman first testified that Ambrose Lewis was simply the "security manager" for David and Desmond, and "I don't think he is a family member." (A. 741). But when confronted with his testimony at a prior proceeding in which Norman referred to Ambrose Lewis as being part of the same family as David and Desmond, Norman said: "What I really heard is he [Lewis] was a cousin." (A. 766-67). Pressed to explain, Norman stated that he heard from an attorney in Ghana that David and Desmond "were from a polygamous[] father [who] had more than one wife and they were a cousin." (A. 767). Norman was plainly making it up as he went along—and these lies were material, as he was trying to convince the jury that he had a legitimate reason to believe that the accounts he was allegedly in control of were legitimate.

Norman lied about the circumstances of the $500,000 forged check that he used, in part, to purchase a Porsche Cayenne for $180,000. In his direct testimony, Norman denied being sued by the credit union where he cashed the check: "I don't think I was sued. I was just given an injunction which mean[s] I couldn't function until these funds were replaced in the credit union. I wasn't sued, I don't think." (A. 632). Norman further testified that, after the injunction was put into place, he used his account at RBC Centura to continue to send funds overseas as part of his program (A. 633), and that the injunction "limited the ability to earn a living." (A. 635). Nearly

41

all of this testimony was false. Norman had in fact been sued by his local credit union, and summary judgment had been granted against him (A. 818); at the time the incident occurred, Norman's account at RBC Centura had already been shut down (*id.*); and Norman admitted he had not been "earn[ing] a living" for years, regardless of the injunction. (A. 818-19). These lies were material because the forged check had purportedly come from the same people who had provided the alleged funds for Norman's phony accounts; Norman's access to bank accounts he had control over was critical to the success of his scheme; and Norman's poor finances in 2001 and 2002—which he hid from his victims—was a significant motivation for the fraud.

Norman lied when he testified that he did not solicit money from individuals in dire financial situations. Recordings of Norman introduced at trial proved the exact opposite. In his direct testimony, Norman was asked: "at any point in time did you ask individuals to borrow monies from institutions knowing that they were in dire financial situation?" Norman replied: "No. I was actually opposed to that." (A. 641). In the recorded call with Cindi Owen, however, Owen specifically told Norman that she had no discretionary income and would have to take a line of credit out on her house, and yet Norman asked her to invest another $50,000. Similarly, emails introduced at trial showed that a victim named Ernest Yoder told Norman that to come up with his investment, he had to use money that was set aside to pay for his daughter's wedding. And Norman also solicited from Marchel Kelley, even though Kelley told Norman she

42

had lost her job and was effectively broke, and would have to sell her truck to invest with Norman. (A. 798-801).

In light of these clear instances of perjury, Judge Forrest had more than sufficient grounds to find that Norman provided materially false testimony to mislead the jury and the court.[5]

Judge Forrest also properly found that Norman's obstruction of justice continued right up to the eve of sentencing. In the days just before his sentencing, Norman two letters to Judge Forrest that claimed, among other things, that the funds he had promised to his victims had at long last "arrived"; that the rea-

––––––––––

[5] Norman's argument that application of the obstruction enhancement would amount to impermissible double counting has no relevance here. In the two cases cited by Norman—*United States* v. *Lloyd*, 947 F.2d 339, 340 (8th Cir. 1991), and *United States* v. *Clark*, 316 F.3d 210, 213 (3d Cir. 2003)—the defendants did not take the stand and commit perjury, as Norman did here. Rather, the obstruction at issue was part of the alleged offenses. Here, on the other hand, Norman's false testimony was separate and apart from his scheme to defraud. *See United States* v. *Matos*, 907 F.2d 274, 276 (2d Cir. 1990) ("When, as here, the district court comes away with the firm conviction that the defendant testified falsely with the intent of impeding the disposition of the criminal charges, there is no constitutional bar to an enhanced sentence.")

son they had not arrived sooner was "an unexpected series of coup attempts from within the project"; that for the funds to be accessed, travel for several of Norman's associates would have to be arranged from Canada; and that he wanted more time before sentencing to "put this 'New Evidence' together, for the good of all." (Docket Nos. 266, 267.) In light of these submissions—which not only continued the lies Norman had told his victims but included new false statements in an effort to delay and influence his sentencing—Judge Forrest properly concluded that Norman was attempting to "willfully obstruct[] or impede[] . . . the administration of justice during the course of the . . . sentencing of the instant offense," U.S.S.G § 3C1.1, and accordingly provide an additional, independent basis to support the obstruction enhancement.

For the reasons set forth above, the district court correctly calculated Norman's Guidelines range, and the sentence imposed was procedurally reasonable.[6]

_____

[6] Even if the Court committed procedural error in calculating the Guidelines range—which it did not —remand is unnecessary in this case because it would be futile. Judge Forrest made it perfectly clear that she believes that Norman deserved a sentence of 240 months' imprisonment, irrespective of the Guidelines calculation. *See United States* v. *Coppola*, 671 F.3d 220, 251 (2d Cir. 2012) ("[E]ven if we were to identify procedural error in that calculation—which we do not—we could confidently conclude that it was

44

## POINT II—Norman's Sentence Was Substantively Reasonable

### A. Applicable Law

If this Court determines that there was no procedural error in imposing sentence, it will "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.* at 51. In applying that standard, the Court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. This Court cannot "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and it should "set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Id.* at 189 (*quoting United States* v. *Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)); *see also United States* v. *Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). When applying that deferential standard of review, this Court will also bear in mind that a sentencing judge may take into consideration her "own sense of what is a fair and just sentence under all the circumstances." *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006). "That is the historic role of sentencing judges, and it may continue

─────────

harmless because the district court would certainly impose the challenged sentence in any event.").

45

to be exercised, subject to the reviewing court's ulti-
mate authority to reject any sentence that exceeds
the bounds of reasonableness." *Id.*

As this Court has also recognized, "[i]f the ulti-
mate sentence is reasonable and the sentencing judge
did not commit procedural error in imposing that sen-
tence, [it] will not second guess the weight (or lack
thereof) that the judge accorded to a given factor or to
a specific argument made pursuant to that factor."
*United States* v. *Pope*, 554 F.3d 240, 246-47 (2d Cir.
2009) (quoting *United States* v. *Fernandez*, 443 F.3d
at 34). The weight that the district court puts on a
particular factor need not be the weight that this
Court would give the factor, as long as "the factor, as
explained by the district court, can bear the weight
assigned it under the totality of circumstances in the
case." *Cavera*, 550 F.3d at 191.

In discussing these familiar principles, this Court
has also observed that the deferential standard it ap-
plies when reviewing a sentence for substantive rea-
sonableness is comparable to the standards it applies
when considering whether a jury's verdict constitutes
a "manifest injustice" or whether state actors have
engaged in conduct that "shocks the conscience."
*United States* v. *Rigas*, 583 F.3d 108, 122-23 (2d Cir.
2009). Like those standards, this Court has ex-
plained, appellate review for substantive reasonable-
ness "provide[s] a backstop for those few cases that,
although procedurally correct, would nonetheless
damage the administration of justice because the sen-
tence imposed was shockingly high, shockingly low,

46

or otherwise unsupportable as a matter of law." *Id.* at 123.

## B. Discussion

Norman argues that the 20-year sentence imposed by Judge Forrest was substantively unreasonable, particularly in light of the sentences given to other defendants charged in the same Indictment. There is no merit to this argument. Judge Forrest based Norman's sentence, which fell within the applicable Guidelines range, not only on the reprehensible nature of Norman's conduct and his total lack of remorse—even when confronted by victims whose lives were devastated by his fraud—but by the fact that Norman continued to solicit victims even after he was arrested and extradited to the United States. Defense witness Marchel Kelley, an unemployed artist with nearly $100,000 in credit card debt, testified that Norman asked her to send him money for the program shortly before she testified. (A. 565, 575). And Norman continued to solicit money from victims while awaiting sentencing. Judge Forrest properly concluded that Norman was incorrigible, and that the only way to protect the public from his continued fraudulent conduct was to impose the maximum sentence available.

The need for specific deterrence was plainly not as acute for the other defendants who were charged in the same Indictment. The most closely-situated defendant was Robert Ingram, who was the leader of a separate advance fee fraud scheme and who employed some of the same co-conspirators as Norman.

47

Ingram received a sentence of 144 months' imprisonment—but, as Judge Forrest noted, Ingram pleaded guilty to his crime and took responsibility for his actions, and there was no evidence that Ingram continued his criminal activity while incarcerated, as did Norman. (A. 1012). Accordingly, the interests of providing just punishment and protecting the public weighed in favor of a sentence considerably longer than the 144 months imposed on Ingram. *See* 18 U.S.C. § 3553(a)(2).

In a case such as this, where the fraud was so brazen, pitiless, long-running, and devastating to so many people of limited means, and where the defendant not only shows no remorse, but continues to perpetrate the fraud from prison while awaiting sentencing, a within-guidelines sentence that happens to be the statutory maximum for the offense of conviction is not only a just result, but arguably the only just result. Norman's sentence was substantively reasonable.

48

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
             July 25, 2014

                Respectfully submitted,

                PREET BHARARA,
                *United States Attorney for the*
                *Southern District of New York,*
                *Attorney for the United States*
                      *of America.*

ANDREA SURRATT,
ANDREW GOLDSTEIN,
KARL METZNER,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 11,674 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: KARL METZNER,
*Assistant United States Attorney*