# 13-2840-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

OLIVIA JEANNE BOWEN, AKA Jeanne Bowen, NOEMI DODAKIAN, AKA
Emi Dodakian, CHONG SHING WU, ROBERT INGRAM,

*Defendants*,

DAVID NORMAN, AKA Jim Norman,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

MEGAN WOLFE BENETT, ESQ.
*Attorney for Defendant-Appellant*
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 687-8181

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .................................................................. ii

1.    The trial court failed to make adequate findings in support of
      certain Sentencing Guidelines enhancements and the sentence
      was thus procedurally flawed ....................................................1

        a. Loss amount ....................................................................3

        b. Number of victims ..........................................................7

        c. Leadership or organizer role enhancement ...................9

        d. Obstruction of justice ....................................................13

2.    The 20-year sentence was substantively unreasonable.................15

3.    Conclusion ..................................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*United States v. Ahders*, 622 F.3d 115 (2d Cir. 2010)............................................2, 8

*United States v. Bradbury*, 189 F.3d 200 (2d Cir. 1999)...........................................14

*United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997) ....................................10

*United States v. Carter,* 489 F.3d 528 (2d Cir.2007) ................................................9

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013).............................................16

*United States v. Espinoza,* 514 F.3d 209 (2d Cir.2008) *cert. denied*,
   553 U.S. 1045 (2008)..........................................................................................2, 9

*United States v. Grayson*, 438 U.S. 41 (1978).........................................................13

*United States v. Kennedy*, 233 F.3d 157 (2d Cir. 2000) ...........................................10

*United States v. Lincecum,* 220 F.3d 77 (2d Cir. 2000)...........................................14

*United States v. Park*, --- F.3d --- , 2014 WL 3289493 (2d Cir.
   July 19, 2014)..........................................................................................................2

*United States v. Skys*, 637 F.3d 146 (2d Cir. 2011) ......................................... 7, 8, 9

*United States v. Spitsyn*, 403 Fed. Appx. 572 (2d Cir. 2010)...................................6

**Statutes**

18 U.S.C. § 3553(a) ..................................................................................................16

U.S.S.G. § 2B1.1......................................................................................................1, 7

U.S.S.G. § 3B1.1.................................................................................... 2, 9, 10, 13

U.S.S.G. § 3C1.1........................................................................................................2

## NORMAN REPLY BRIEF

Following a jury's conviction of a single fraud count, David Norman, a (then) 65 year old Canadian musician with no criminal history, was sentenced by the District Court to the maximum possible sentence – 20 years in prison. Every other defendant named in his indictment – an indictment setting forth two fraud schemes, only one of which involved Norman – were sentenced (by a different court) to terms between approximately 8 years to 15 years shorter than Norman's sentence.

Imposing several challenged enhancements under the Sentencing Guidelines without adequate factual findings or support in the record, the district court's sentence was procedurally flawed. Further, the 20 year sentence was so excessive under the circumstances as to render it substantively unreasonable. For the reasons set forth in appellant's opening brief and herein, Norman's sentence should be vacated and remanded to the trial court for resentencing.

**1. The trial court failed to make adequate findings in support of certain Sentencing Guidelines enhancements and the sentence was thus procedurally flawed**

The trial court imposed enhancements under the Sentencing Guidelines based on, as relevant here:

   a. a loss amount of over $2.5 million under U.S.S.G. § 2B1.1(b)(1)(j);

   b. a crime involving 50 or more victims under U.S.S.G. § 2B1.1(b)(2)(B);

1

    c.  Norman being a leader or organizer of a criminal activity involving five or more participants or that was otherwise extensive under U.S.S.G. § 3B1.1(a); and

    d.  obstruction of justice under U.S.S.G. § 3C1.1.

The government bore the burden of proving by a preponderance of the evidence the facts in support of each Sentencing Guidelines enhancement. *United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011). In calculating the applicable Sentencing Guidelines range, the district court was required to make "specific factual findings" as to each of the enhancements it imposed. *United States v. Ahders*, 622 F.3d 115, 119 (2d Cir. 2010), quoting *United States v. Espinoza,* 514 F.3d 209, 212 (2d Cir.2008) *cert. denied*, 553 U.S. 1045 (2008).

Even if the sentencing court made specific factual findings, if the reviewing court is "left with the definite and firm conviction that a mistake has been committed" remand to the district court for resentencing (or additional fact-finding) is a proper remedy. *United States v. Park*, --- F.3d --- , 2014 WL 3289493, *4 (2d Cir. July 19, 2014) (finding probationary sentence both procedurally and substantively unreasonable, vacating sentence and remanding for plenary resentencing.)

Here, the district court's errors resulted in an offense level that was 8-points too high (37, instead of 29) and a corresponding Sentencing Guidelines range of 210 – 237 months instead of 87 – 108 months.

2

### a. Loss amount

The sentencing court applied an 18-point enhancement for losses of over $2.5 million, but never calculated or estimated any actual figure, instead conclusorily stating that the loss amount was over that $2.5 million threshold. This was error.

Though it had ample time, opportunity and means to present evidence of the loss amount to the jury (having previously tried several of Norman's co-conspirators and having indicted Norman nearly five years before his trial), the federal government opted to present direct evidence of only about $350,000 in losses. It also introduced summaries of bank records showing deposits to Norman's account from December 2002 through March 2005 of $2,114,997, arguing at sentencing that all such deposits were the proceeds of illegal activity. A. 826.7 – 826.35; A.925. [1]

Before reaching a conclusion as to loss amount, the sentencing court noted "a couple of different ways in which the Court may estimate the loss." A. 976. After observing that "[a]mong those ways are approximating the number of victims multiplied by the average loss to each victim" the court also quoted the application note setting forth an "alternative way" of "taking into consideration … more

---

[1] Citations "A." refer to the Appendix; "Gov't Br." to the respondent's brief; "App. Br." to Norman's opening brief; and "PSR" to the presentence investigation report, which was filed under seal.

general factors such as the scope and duration of the offense and revenues generated by similar operations." A. 976.  The sentencing court then said that it would, "[b]ased upon the totality of circumstances",  "credit the testimony during the direct-examination … where Mr. Norman himself testified … that he had obtained millions.  And then on cross-examination that the amount was somewhere between six and nine million dollars." A. 978.  The district court therefore found "that there is a very strong basis to find that the loss amount is … more than $2.5 million", reaching that finding "with absolute ease and that's based again upon the direct testimony of Mr. Norman himself" and "the fact that there are bank records which are suggestive of over two million dollars just for the short period of time that we have" and that the defendant testified that after that period "he continued to receive money." A. 979 – 80. [2]

The sentencing court's statements regarding the loss amount are conclusory, unduly speculative and are insufficiently supported by corroborating evidence to warrant the 18-point enhancement for losses between $2.5 and $6 million.

---

[2] Contrary to the government's assertion, Norman never suggested that the sentencing court based its loss amount finding "solely" on his testimony. Gov't Br., p. 26.  Rather, he argued then – and again now – that the court looked "primarily" at his unreliable testimony to justify the loss amount, and failed to employ any calculation methodology. App. Br., p. 17.

The documentary evidence of Norman's banking activity show deposits of under $2.5 million dollars.[3]  And while the sentencing court could, certainly, employ an estimation method in calculating the loss amount beyond what was presented in the documentary evidence and government witness testimony, it did not do so.  It explained what methods it might use, it suggested that it was extrapolating the losses from the records introduced at trial, and then it simply stated that the loss amount was greater than $2.5 million.  As with other Sentencing Guidelines, a loss amount estimation should rest on adequate evidence specific to the defendant.  Thus, this Court has held, for example, "that a court may not assume that because the defendant was convicted of dealing drugs, all the money that he has is drug money." *Archer*, 671 F.3d at 164 (in establishing an enhancement for the number of fraudulent documents involved, relying on statistical projection of the total number of documents must rely on evidence that the trial evidence of fraudulent documents was a representative sample of the entire population of documents), citing *United States v. Jones*, 531 F.3d 163, 177 (2d Cir. 2008).  Likewise, it is error to conclude that "simply because a defendant was convicted of cashing forged checks … every check he cashed was fraudulent."

---

[3] Several of those deposits were, as the government now does not dispute, made from entities connected with Norman himself, including "David PJ (Jim) Norman" and "Thurm Records" and the government admits that at least some small number of the deposits are "fairly characterized as wire transfers from non-victims," so simply assuming that every deposit made into his account was connected to the fraud is contradicted by the record. Gov't Br., p. 29.

5

*Archer*, 671 F.3d at 164, citing *United States v. Spitsyn*, 403 Fed. Appx. 572 (2d

Cir. 2010) (summary order.)

To the extent that the trial court relied on Norman's testimony as to money

raised in the fraud scheme or his lack of any other substantial income during the

relevant period in reaching a loss amount figure, doing so was error.  Norman's

testimony was consistent only in its inconsistency.  He was repeatedly vainglorious

and implausible, insisting on the legitimacy of the investment scheme in the face of

direct evidence to the contrary.[4]  In light of his testimony as a whole, his statement

that he raised "between 6 and 9" million dollars (A. 840) without any evidentiary

support was untrustworthy and unreliable and should not have served as the

primary basis of a loss amount finding.[5]

_____

[4] Norman, for example, continued to absurdly insist that the World Bank and the
International Monetary Fund held individual depository accounts even after
listening to the testimony from representatives of those organizations explaining
the nature of their institutions.  In light of some of Norman's fantastical testimony,
after trial counsel was relieved, substituted counsel made a post-trial *ex parte*
request for a psychiatric expert, which was denied. *See* 07-cr-961 (S.D.N.Y.),
Docket Nos. 247 – 48, dated 04/04/2013.

[5] A further complication is that Norman was Canadian and the bank records
introduced at trial are from his Canadian bank account.  To the extent that
Norman's testimony referred to "dollars", there was no testimony clarifying if
those were Canadian or United States dollars. *See generally* A. 839 – 40; *see also*
A. 603 – 27; 634 – 44 (FBI Agent Deanna Pennetta's testimony, referring only to
"dollars.")  Given that historical exchange during the period charged in the
indictment were at times as high as 1.27 United States dollars for 1.00 Canadian
dollar, the sentencing court should have clarified if the loss amount finding was

6

The district court's failure to identify how she calculated the loss amount (instead only stating that it was "over $2.5 million") and the lack of support from the government for that loss amount figure renders the loss amount calculation procedurally flawed and warrants remand for factual findings on the record as to the actual or intended losses.

**b. Number of victims**

The district court's imposition of the 4-point enhancement under U.S.S.G. § 2B1.1(b)(2)(B) for a fraud involved more than 50 victims was not supported by sufficient factual findings and was, therefore, error.

In reaching its finding on the victim number, the district court relied on the government's summary chart of wire transfers and Norman's testimony without any findings of fact as to which of those wire transfers represented victims (as opposed, for example, to legitimate exchanges of funds). A. 981 – 82. This rote adoption of the wire transfer chart as proof that the transfers were made by victims is not sufficiently clear as to permit meaningful appellate review. *United States v. Skys*, 637 F.3d 146, 152 (2d Cir. 2011).

Further, contrary to the government's suggestion, the district court did not explicitly adopt the factual findings regarding victim numbers set forth in the presentence report so as to adequately support the victim number enhancement.

---

based on the figure being in United States of Canadian dollars and if on the latter, then what the comparable United States dollar figure would have been.

Before embarking on its rulings regarding each Sentencing Guideline, the district court briefly mentioned that it would "adopt the factual finding of the PSR." A. 974. When discussing the victim number calculation, however, it never referred to the PSR. A. 981 – 82. Consequently, the finding on the victim number cannot be said to be supported by the PSR's factual assertions and the district court's conclusion as to the victim number was thus erroneously made without the requisite specific factual findings. *Skys*, 637 F.3d at 157.

Even if the sentencing court did adequately adopt the PSR in connection with the victim number, however, because the PSR was vague as to the number of victims involved in Norman's fraud, it did not provide an adequate basis for finding by a preponderance of the evidence that the number of victims exceeded fifty. *Ahders*, 622 F.3d at 119 ("A district court need not specifically recite all the facts relevant to its Guidelines calculation; rather, it is sufficient for the district court to adopt the findings in the presentence report- *if* those findings are adequate to support the sentence imposed") (emphasis in original). The PSR in this case refers to "over 50 investors" who were victims of both the Count One fraud, with which Norman was charged, and the Count Two fraud, with which he was not. PSR, pp. 6, 16. In discussing Norman's fraud count, the PSR does not set identify the number of victims. PSR, pp. 20 – 23. It is, in fact, impossible to tell from the PSR what number of people were victims of the Count One fraud. Even if the

8

sentencing court explicitly adopted the findings in the PSR, then – which it did not
– its "reliance on the inadequate findings of the PSR, without more, constituted
plain error" and warrants remand for resentencing. *United States v. Carter,* 489
F.3d 528, 540 (2d Cir.2007).

### c. Leadership or organizer role enhancement

The 4-point organizer or leader role adjustment under U.S.S.G. § 3B1.1(a)
must be supported by specific findings as to the number of criminally culpable
participants or the otherwise extensive nature of the scheme. *See Espinoza*, 514
F.3d at 212 ("Our precedents are uniform in requiring a district court to make
specific factual findings to support a sentence enhancement under § 3B1.1")
(internal quotation marks omitted).

"To be 'sufficiently specific to permit meaningful appellate review[, i]t is
not enough for the court merely to repeat or paraphrase the language of the
guideline and say conclusorily that the defendant meets those criteria.'" *Skys*, 637
F.3d at 157, quoting *United States v. Ware*, 577 F.3d 442, 452 (2d Cir. 2009).

The U.S.S.G. § 3B1.1 role enhancement can be based on criminal activity
involving five or more participants or criminal activity that was otherwise
extensive.  For application based on the five or more participants prong, "the
government must show four people other than the defendant who were 'criminally
responsible for the commission of the offense.'" *Archer*, 671 F.3d at 165, quoting

9

U.S.S.G. § 3B1.1 cmt. n. 1. "To qualify on the 'otherwise extensive' ground …
the government can include 'the unknowing services of many outsiders' in tallying
the scope of the fraud." *Id.*, quoting U.S.S.G. § 3B1.1 cmt. n. 1. The "otherwise
extensive" prong is not "a *lesser* requirement than five knowing participants."
*United States v. Carrozzella*, 105 F.3d 796, 803 (2d Cir. 1997), *abrogated in part
on other grounds by United States v. Kennedy*, 233 F.3d 157, 160 – 61 (2d Cir.
2000). Rather, under this prong, the relevant factors are the number of knowing
participants; the number of unknowing participants whose activities were
organized or led by the defendant with specific criminal intent; and the extent to
which the services of the unknowing participants were peculiar and necessary to
the criminal scheme. *Archer*, 671 F.3d at 165. Thus, the otherwise extensive
"branch … is not so much about extensiveness in a colloquial sense as about the
size of the organization in terms of persons involved that a defendant 'organize[d]'
or 'le[d].'" *Carrozzella*, 105 F.3d at 803.

 Here, the district court referred to both the five or more prong as well as the
otherwise extensive prong. A. 982. The court then stated that

> the testimony for Mr. Norman himself makes clear that [John
> Billingsly, John Bailey and Anne Henshaw] were, in fact, part of it.
> Indeed, the e-mail that I received this morning again refers to Ms.
> Henshaw. But in any event, even putting that aside the trial testimony
> of Mr. Norman as well as the documentary evidence well and truly
> implicates these individuals repeatedly in the scheme. Mr. Norman
> himself refers to Ms. Henshaw as recipients of some of the solicited
> funds etc., etc. So if I were to just look at the number of people the

Court is easily able to find that even of those that we are naming, putting aside those we don't even know if they exist or not but those that we are naming we need the number. So, Mr. Billingsly, Ms. Dodakian, Ms. Palmer, Ms. Bowen, Mr. Bailey, Ms. Henshaw, Mr. Norman himself and there are numerous other people who were described, generally speaking, from time to time as being facilitators. The word "facilitators" was used by Mr. Norman in his direct testimony as describing the kind of expertise that some of these people had who could assist with the scheme and he spoke about them in terms of being numerically large, although, did not put a number on it. … Therefore, the Court finds that the factors needed to meet the 3B1.1 aggravating role enhancement of four levels are met and that that adjustment is appropriate.

A. 983 – 84.

Then, when later addressing this issue again, the sentencing court went on to

state

I just want to make sure that we're clear that 3B1.1A does have alternative bases for finding the four level enhancement. The Court finds that both bases are met. Only one of those basis need be met. Both here are met. There is – it was otherwise extensive. And that has to do with both numbers of people and other things. But in terms of people, I would say that it's not just the Court's finding. It's not solely based upon the testimony of Mr. Norman. For instance, the website that was part of the solicitation materials relating to this scheme references some of these people from time to time. There are documents that reference these people from time to time and so there were other parts of the record that corroborates and make it appropriate to include them as well as crediting Mr. Norman's testimony just to those pieces.

A. 399.

When addressing the five or more prong, however, the sentencing court

made no findings as to the criminal culpability of the individuals recited – and a

11

review of Norman's testimony regarding those individuals leaves open serious questions as to their very existence, as the court appears to have acknowledged ("putting aside those we don't even know if they exist or not"), let alone their criminal culpability.

Though the co-conspirators Bowen and Dodakian could surely be considered knowing participants, there was insufficient evidence to establish by a preponderance the identities of at least three other criminally culpable participants. Norman's testimony referred to many different individuals, some of whom he could not even verify existed as he had only ever communicated with them via email. *See, e.g.,* A. 609, 613, 615. While the trial court recited the additional three names of John Billingsly, Linda Palmer, John Bailey and Anne Henshaw as counting toward the five or more participants total, the court made no findings as to the criminal culpability of those individuals and, indeed, the trial record contained insufficient evidence of the criminal role of Billingsley, Bailey and Henshaw. The imposition of the role enhancement on the five or more criminally culpable participants ground was, therefore, clear error.

Likewise, the sentencing court gave no objectively reviewable explanation for its characterization of the activity as being otherwise extensive. The statement that the court's finding had "to do with both numbers of people and other things" such as "the website that was part of the solicitation materials relating to this

12

scheme" which "references some of these people from time to time" and "documents that reference these people from time to time"  are wholly insufficient to allow meaningful appellate review.  Accordingly, the imposition of the section 3B1.1(a) enhancement was clear error warranting remand.

### d.  Obstruction of justice

The district court selectively adopted those portions of Norman's trial testimony regarding loss amount, then rejected the rest of his testimony in order to impose a 2-point enhancement for obstruction of justice.  In simultaneously crediting and discrediting Norman, when the record did not support doing so, the district court erred.

Norman presented a good faith defense, arguing that he believed in the validity of the "investment" scheme.  Consistent with that defense, Norman testified as to his state of mind and belief in the program.  Though, as discussed above, the district court relied heavily on Norman's testimony in finding a loss amount of more than $2.5 million, it also discredited the rest of his testimony.  A. 988 – 90.  The district court thus found that Norman had consciously lied with the purpose of obstructing justice. A. 991.

As the Supreme Court has cautioned, a sentencing judge need not "enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false."*United States v. Grayson*, 438 U.S. 41, 55 (1978).  Rather,

13

"[b]efore imposing the adjustment, the district court must find that the defendant consciously act[ed] with the purpose of obstructing justice." *United States v. Lincecum,* 220 F.3d 77, 80 (2d Cir. 2000) (quotation marks omitted). "In order to impose a §3C1.1 obstruction-of-justice enhancement on a defendant who has raised an issue as to his state of mind concerning the conduct alleged to have obstructed or impeded the administration of justice, the court must make a specific finding of intent." *United States v. Bradbury*, 189 F.3d 200, 204 (2d Cir. 1999) (internal quotation marks omitted).

In this case, though the district court repeatedly stated that Norman lied, there were no specific findings concerning Norman's intent to impede or obstruct the administration of justice – instead, the findings were that Norman "lied", was a "conman," was trying to "con" the court and "perjur[ed] himself." A. 990 – 91. Though the court concluded that "there was material information as to which [Norman] attached to both mislead the jury and to mislead the Court in the context of the sentencing proceeding," A. 991, the court never elucidated what, exactly, supported its conclusion that Norman's testimony was intended to obstruct the trial. Without a specific finding that Norman's testimony was intended to impede or obstruct justice, especially when doing so doubly punished Norman by selectively crediting only that portion of his testimony that was to his disadvantage at sentencing, imposition of the two points was unreasonable and warrants remand.

14

### 2.  The 20-Year Sentence was Substantively Unreasonable

The district court's imposition of the statutory maximum sentence of 240 months in this case was substantively unreasonable.  The court relied primarily on Norman's insistence on proceeding to trial and continued insistence as to the legitimacy of his scheme when explaining why the substantial sentencing disparity between Norman's 240-month term and the 144-month term imposed on his most similarly situated co-defendant was appropriate. A. 1012.  As far as the sentencing court was concerned, Norman's exercising his constitutional right to go to trial and continuing to try to justify his conduct justified a sentence over 8 years longer than the leader of the Count Two conspiracy.[6]   For a now 66 year old man with no prior criminal history whose malfeasance, though serious, was nonviolent and was inconsistent with his prior behavior, a sentence that most likely will leave him to die in custody after nearly two decades behind bars is substantively unreasonable.

Norman was sentenced to a term over eight years longer than the co-defendant most "similarly situated" to him, who was also a "leader[] of the scheme." A. 1048 – 49.  In justifying this disparity, the district court primarily relied on Norman's decision to go to trial instead of accept a plea of guilty and his

---

[6] The district court also relied on what was described as Norman's "ongoing criminal activity during the time prior to the sentencing," A. 1012, which appears to refer to email communications sent to the court and others via the Bureau of Prisons Trulincs system in which he continued to insist that actual funds existed. A. 968, 1005.  Norman has never, however, been charged with any additional criminal misconduct.

15

continued insistence (including email communications to the district court) as to the validity of his investment scheme. A. 1012.

The statutory maximum sentence of 20 years in prison for a first-time, non-violent 65-year old (at the time of sentencing) offender who had already served nearly two years in a Canadian jail and whose most comparable co-defendant was sentenced to a term over eight years shorter was an abuse of discretion. Norman's sentence was substantively unreasonable and this matter should therefore be remanded for resentencing in light of such a finding.

## 3. Conclusion

Given the district court's focus on the statutory maximum sentence, it is not clear that the sentencing guidelines range or the 18 U.S.C. § 3553(a) factors were properly considered. *See United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) (remanding for resentencing when "appellants' maximum sentences had an air of inevitability" and the section 3553(a) factors were not clearly taken into consideration). In light of procedurally flaws in the sentence and its substantive unreasonableness, appellant David Norman respectfully requests that his sentence be vacated and remanded to the district court for resentencing.

Dated this 8th day of August 2014.

Respectfully submitted,

MEGAN WOLFE BENETT, ESQ.

16

By: ___/s/ Megan Wolfe Benett, Esq.
750 Third Avenue
New York, NY 10017
Telephone: (212) 973-3406
Facsimile:  (212) 972-9432

*Attorney for Defendant-Appellant,*
*David Norman*

17

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

        This brief contains 4,014 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

        This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2003, in 14 pt. font size, Times New Roman.

/s/ Megan Wolfe Benett

Attorney for Defendant-Appellant

Dated:  August 8, 2014